Filed  9/13/13  In re B. M. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.M., a Person Coming Under the Juvenile Court Law. | H039064 (Santa Cruz County Super. Ct. No. DP002628) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. S.R., Defendant and Appellant. | |

In April 2012, the Santa Cruz County Human Services Department (Department) filed a petition alleging the failure of the Mother, S.R., and Father, E.M., to protect and provide support for their daughter, B.M. (now three; the minor), under Welfare and Institutions Code section 300, subdivisions (b) and (g), respectively.[1]  In July 2012, the juvenile court sustained the petition, bypassed reunification services for both parents, and set a date for the permanency hearing.  Shortly before that hearing, Mother filed a petition under section 388 to change the court's prior order setting a permanency hearing

_____

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

and to request that reunification services be ordered. In December 2012, the court denied her petition without an evidentiary hearing. Immediately thereafter, the court granted the Department's petition, (1) finding the minor to be adoptable, (2) concluding that the beneficial parental relationship exception was inapplicable, and (3) ordering that the parental rights for both Mother and Father be terminated.

On appeal, Mother contends that the juvenile court erred in three main respects. First, she argues that because she made a prima facie showing of changed circumstances, the court erred in summarily denying her section 388 petition without affording her a hearing. Second, Mother asserts that the court's finding that the minor was adoptable was not supported by substantial evidence. Third, she contends that the court erred in concluding that she had not met her burden of establishing the beneficial parental relationship exception to adoption. We reject each of Mother's appellate claims. Accordingly, we will affirm the order declaring adoption as the permanent plan for the child, B.M., and terminating the parental rights of Mother and Father.

FACTS AND PROCEDURAL HISTORY

I. *Initial April 2012 Petition and Detention Order*

On April 5, 2012, the Department filed a petition alleging that the parents had failed to protect the minor and that she had been left without any provision for support. (§ 300, subds. (b), (g).) The Department alleged, inter alia, that both parents had untreated or undertreated substance abuse issues; Father was on federal probation related to drug trafficking; Father had beaten Mother and choked her until she was unconscious, Mother believing at the time that he was going to kill her; and both parents had left the minor in the care of her maternal grandmother, J.R., a woman who had had an extensive child welfare history that included substantiated substance abuse and physical abuse.

2

On April 6, 2012, the court ordered the minor detained pursuant to section 319, subdivision (a). The court ordered that Mother be permitted supervised visitation of the minor at a minimum of three times per week.[2]

II.     *May 2012 Jurisdiction/Disposition Report*

In its May 2012 jurisdiction/disposition report, the Department reported that after the minor was detained by court order on April 6, 2012, she was placed in a licensed foster home in Santa Cruz County. The Department reported a series of occurrences that led up to the filing of the petition in April.

In January, 2011, Mother and the minor had been "kicked out of a relative's home," and had been "staying in various hotels on vouchers." Mother had reportedly used heroin and methamphetamine in the minor's presence.

On August 3, 2011, Mother was arrested after attempting to bring six grams of methamphetamine and a glass pipe into a Santa Cruz County Courthouse.[3] The items were in Mother's purse and were discovered during screening. She claimed that the purse and its contents belonged to a friend, K. (Six days later, Mother told a social worker that the purse and its contents had belonged to her cousin, M.) She admitted, however, that she was a recovering methamphetamine addict and had used the drug the previous evening.

On March 13, 2012, the Department investigated a report of physical abuse of the minor inflicted by her maternal grandmother, J.R. The minor at that time was living with J.R.; neither Mother nor Father lived in J.R.'s home. It was reported that J.R. "was very

---

**[2]** On May 8, 2012, after the Department provided notice pursuant to the Indian Child Welfare Act (ICWA), the court made a finding that an ICWA notice had been timely provided. On June 1, 2012, the court issued an order concluding that E.M. was the presumed father of the minor.

**[3]** The record does not disclose whether the minor was with Mother at the time of the incident.

3

rough with [the minor] . . . [had] cuffed [her] on [the] back as she was going inside and [the minor] fell forward . . . . Of concern is that the grandmother, [J.R.,] has a significant CPS history and substantiated physical abuse of the [M]other, [S.R.,] and her sister[,] the maternal aunt."[4]

On March 18, 2012, the Department investigated reports of neglect of the minor by Mother and emotional abuse by Father. Early that morning, it was reported that Mother and the minor were visiting Father at his home in the Boulder Creek area of Santa Cruz County. Father, who was on federal probation, was in a residential treatment program in San José and had allegedly received a "day pass" to come home. Mother and Father, who had both been drinking hard liquor, began arguing, and "[F]ather started beating the [M]other and choked her until she was unconscious. [She] sustained a laceration to her head. The [F]ather is being charged with attempted murder and child endangerment. The [F]ather beat the [M]other while [the minor] was in the same room (unknown if [the minor] witnessed this event)." The Mother fled on foot to a neighbor's house and called J.R., who picked her up and drove her to the hospital. Father was later located with the minor at a family member's home and was arrested.[5] The minor was released to the care of her grandmother, J.R. Afterward, J.R. reported to a social worker that Mother had left the area and left the minor in J.R.'s care. Mother failed to respond to the social worker's calls for two weeks, and J.R. failed to cooperate with the Department in its investigation.

---

**4** The report also included a lengthy historical narrative of J.R.'s neglect of Mother when she was a minor.

**5** It was indicated in the report that Father, on April 23, 2012, had been sentenced to 15 months in federal prison for his most recent parole violation, and that upon completion of service of this sentence, he would be transported back to Santa Cruz County for the warrant arising out of the March 18, 2012 incident.

The social worker reported that "past reports indicate that [Mother] has been using alcohol and [methamphetamine] since the age of 15." (Mother was 24 at the time of the May 2012 report.) It was reported that Mother completed a first Proposition 36 drug treatment program in May 2008. After her arrest in August 2011, she received an order to undergo a second Proposition 36 drug treatment program, which had not been completed as of May 2012.

The social worker summarized: "[The minor], who is not quite two years old[,] has lived in chaos, has not known who . . . her primary caretaker is, has been passed from family member to family member, all of which struggle with stability and substance abuse. [The minor] deserves a drug[-]free and violen[ce-]free home life. She deserves stability and safety, two areas [Mother] is still working on for herself."

In a June 20, 2012 supplemental report, the Department indicated that it had not been provided any record that Mother had presented herself for drug testing, notwithstanding her statement that she had been tested on June 4. Additionally, Mother missed a June 4 appointment for an alcohol and drug assessment. The social worker also reported that Mother had said that she had not used drugs since May 18, 2012.

III.   *June 2012 Jurisdictional Hearing*

A contested jurisdictional hearing took place on June 29, 2012, in which the Department, Mother, Father, and the minor appeared through counsel. The court heard significant evidence, including the testimony of Mother, the maternal grandmother, J.R., Father's cousin, and the social worker assigned to the case. The court sustained the allegations of the petition and found that it had jurisdiction over the minor pursuant to section 300, subdivisions (b) and (g).

At a continued hearing on July 5, 2012, the court granted the Department's motion to reopen evidence. Mother testified that she had left an in-patient, 28-day residential

5

drug treatment program called Janus on the evening of July 4, after spending 17 days in the program. She did not have permission from the Department to leave the program.[6] The court found that reunification services should be bypassed as to Father and Mother, pursuant to section 361.5, subdivisions (e)(1) and (b)(13), respectively.[7] It set a selection and implementation hearing for October 30, 2012, which was later continued to December 3, 2012.

IV.     *October 2012 Assessment Pursuant to Section 366.26*

On October 30, 2012, the Department filed its assessment, pursuant to section 366.26. In the report, it reviewed, inter alia, the minor's history before being made a dependent of the juvenile court; the status of Mother's supervised visits with the minor; the minor's physical and emotional condition; the minor's foster care status; and its opinions concerning the minor's adoptability.[8] The Department concluded that the minor was adoptable, and recommended that the parental rights of Father and Mother be terminated and that a permanent plan of adoption be established.

V.     *Mother's November 2012 Petition to Change Order*

On November 26, 2012, Mother filed a "request to change order" (petition) pursuant to section 388. She requested that the court vacate the selection and implementation hearing and order reunification services for Mother. The court ordered that proceedings on whether Mother had made a prima facie showing requiring a hearing

---

[6] Mother testified that she had left Janus because of a job opportunity and had planned to continue with the program on an out-patient basis. It was later reported that Mother was in the residential treatment program for 14 days, and left Janus after she became angry at staff who asked her to provide a urine sample for drug testing.

[7] Neither Mother nor Father challenged the jurisdictional order, including the order bypassing reunification services. (See Cal. Rules of Court, rules 8.450, 8.452.)

[8] Further information contained in the assessment that is relevant to this appeal is discussed, *post.*

on the petition be held on December 3, 2012, at the time of the selection and implementation hearing.

VI.    *December 2012 Permanency Hearing*

At the selection and implementation (permanency) hearing on December 3, 2012, the court first addressed Mother's section 388 petition.[9] After asking several questions of Mother and hearing argument, the court denied the Mother's request for a hearing on her section 388 petition, finding that there were no changed circumstances presented and that it was not in the minor's best interest to grant a hearing.

The court then conducted the section 366.26 permanency hearing, receiving documentary evidence and testimony from Mother. The court found by clear and convincing evidence that the minor was both generally and specifically adoptable, and approved the permanent plan of adoption. The court concluded further that there was no compelling reason for finding that termination of parental rights would be detrimental to the child and, accordingly, terminated the parental rights of Mother and Father. It set a permanent placement review hearing for June 6, 2013. Mother filed a timely notice of appeal. That order is one from which an appeal lies. (§ 366.26, subd. (i)(1); see *In re Matthew C.* (1993) 6 Cal.4th 386, 393, superseded by statute on another point as stated in *People v. Mena* (2012) 54 Cal.4th 146, 156.)

DISCUSSION

I.    *Applicable Legal Principles*

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) As our high court has explained, "The objective of the dependency scheme is to protect

---

[9] The court also addressed and denied the motion of Father (incarcerated in federal prison in Los Angeles) for continuance of the selection and implementation hearing.

7

abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.] Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (§ 366.26, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.) There are six statutory choices for the permanency plan; the preferred choice is that the child be ordered to be placed for adoption, coupled with an order terminating parental rights. (§ 366.26, subd. (b); see also *In re Celine R.*, *supra*, 31 Cal.4th at p. 53 ["Legislature has thus determined that, where possible, adoption is the first choice"]; *ibid.* [where child is adoptable, "adoption is the norm"].)[10] The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).)

_____

[10] "(b) At the hearing, which shall be held in juvenile court for all children who are dependents of the juvenile court, the court, in order to provide stable, permanent homes for these children, shall review the report as specified in Section 361.5, 366.21, 366.22, or 366.25, shall indicate that the court has read and considered it, shall receive other evidence that the parties may present, and then shall make findings and orders in the following order of preference: [¶] (1) Terminate the rights of the parent or parents and order that the child be placed for adoption and, upon the filing of a petition for

*(continued)*

8

Thus, at the permanency planning hearing, "in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.] '[T]he decisions made at the review hearing regarding reunification are not subject to relitigation at the termination hearing. This hearing determines only the type of permanent home.' [Citation.]" (*In re Cynthia D.* (1993) 5 Cal.4th 242, 249-250, quoting Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988).)

"If the court determines it is likely the child will be adopted, certain prior findings by the juvenile court (e.g., that returning the child to the physical custody of the parent

adoption in the juvenile court, order that a hearing be set. The court shall proceed with the adoption after the appellate rights of the natural parents have been exhausted. [¶] (2) Order, without termination of parental rights, the plan of tribal customary adoption, as described in Section 366.24, through tribal custom, traditions, or law of the Indian child's tribe, and upon the court affording the tribal customary adoption order full faith and credit at the continued selection and implementation hearing, order that a hearing be set pursuant to paragraph (2) of subdivision (e). [¶] (3) Appoint a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child, and order that letters of guardianship issue. [¶] (4) On making a finding under paragraph (3) of subdivision (c), identify adoption or tribal customary adoption as the permanent placement goal and order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. [¶] (5) Appoint a nonrelative legal guardian for the child and order that letters of guardianship issue. [¶] (6) Order that the child be placed in long-term foster care, subject to the periodic review of the juvenile court under Section 366.3. [¶] In choosing among the above alternatives the court shall proceed pursuant to subdivision (c)." (§ 366.26, subd. (b).)

would create a substantial risk of detriment to the physical or emotional well-being of the child) shall constitute a sufficient basis for the termination of parental rights unless the juvenile court finds one of six specified circumstances in which termination would be detrimental [to the child]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1522-1523, citing § 366.26, subd. (c)(1).) The six specified circumstances in section 366.26, subdivision (c)((1)(B) may serve as compelling reasons for the court's electing not to terminate parental rights if it finds that such "termination would be detrimental to the child." These circumstances are "actually *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) They " 'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*, original italics.) One such exception—urged by Mother here—based upon the beneficial parental relationship, requires a showing that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

  II.  *Evidentiary Hearing on Section 388 Petition Was Properly Denied*

    A.  *Applicable Law*

  After the court has determined the child to be a dependent of the juvenile court, "[a]ny parent or other person having an interest in the child" may petition the court to change, modify or set aside a previous juvenile court order based upon a change of circumstances or new evidence. (Former § 388, subd. (a), amended by Stats. 2012, ch.

10

846, § 30.5, p. 6895, eff. Jan. 1, 2013.)[11] A parent seeking modification of a prior court order pursuant to a section 388 petition must "make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]" (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) The petition is liberally construed in favor of its sufficiency. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; see also Cal. Rules of Court, rule, 5.570(a).) "There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) If the petition's allegations, liberally construed, do not show changed circumstances under which the child's interests would be promoted by changing a prior order, the court need not order a hearing on the section 388 petition. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) The parent's burden of showing that changed circumstances are sufficient that the child's interests would be promoted by modifying a prior order "is a difficult [one] to meet in many cases, and particularly so when . . . reunification services have been terminated or never ordered. After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the

---

[11] "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and . . . shall state the petitioner's relationship to or interest in the child . . . and shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." (Former § 388, subd. (a).) "If it appears that the best interests of the child may be promoted by the proposed change of order . . . the court shall order that a hearing be held and shall give prior notice . . ." (Former § 388, subd. (c).)

11

needs of the child for permanency and stability. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

A determination on whether to change an order by granting a section 388 petition "is 'committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] An abuse of discretion occurs when the juvenile court has exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642, quoting and citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

B.     *Background Concerning Section 388 Petition*

Eight days before the permanency hearing, Mother filed a petition pursuant to section 388 requesting that the permanency hearing be vacated and that reunification services be ordered. She alleged that "Mother believes that it is in [the minor's] best interest to have her mother in her life not only as her mother, but also as her teacher, mentor and best friend." An attachment to the petition included the following statement: "Mother reports sobriety date of 5/22/2012."

In the petition, Mother incorporated by reference her letter dated November 20, 2012. Mother stated in the letter that she and the minor had a very close mother-daughter relationship; "being separated from [the minor] has devastated and destroyed [Mother] as a person, parent, and a mother"; "[m]ost of all[, the minor] is the one truly suffering greatly from this incident"; and "it would be a [great injustice] to let [the minor] grow up and not have [Mother] as her teacher, mentor, as well as her best friend, and most of all her mother." Mother closed: "Everything that has been asked of me I have done or [am] in the process of completing. I['']m enrolled in parenting classes, domestic violence classes, [and] treatment groups; I see a therapist and attend daily NA and/or AA meetings. I['']m changing my life not only for myself, but for the best interest of my daughter . . .

12

Now I ask this of you in the best interest and well[-]being of my daughter, please return [the minor] to me."

As attachments to her letter, Mother included three pages of logs that apparently represented her attendance at various NA/AA meetings. Although she indicated in the letter that her attendance at such meetings was "daily," the logs appear to show that Mother attended eight meetings out of the 31 days of July, 10 days out of the 31 days of August, nine days out of the 30 days of September, 10 days out of the 31 days of October, and 14 days out of the 20 days of November prior to her letter. Also attached was a letter indicating that Mother had attended her first counseling session at a domestic violence center on November 19.

The court asked several questions of Mother concerning her section 388 petition. She indicated that she had entered a treatment facility on November 27, 2012; attended some AA meetings between July and November, 2012;[12] been sober since May 22, 2012; commenced domestic violence counseling on November 19, 2012, attending two sessions; and planned to attend parenting classes beginning in January 2013. The court, in denying the request for hearing, noted that the record showed that Mother had "been struggling with treatment and sobriety and intervention since 2006." It observed that Mother had a safety plan that she had not complied with, had left the Janus drug treatment program, and had had "[a] series of relapses." It indicated that while Mother claimed to have been sober since May 2012, there was no proof that this was true. The court remarked that the law required changed, "[n]ot changing," circumstances for a section 388 petition. It indicated that there were not even changing circumstances, as Mother had only within the past week started a drug treatment program, had only recently

---

**12** The court indicated that it "really struggled with [the] signoff sheet[s] because a lot of the writing looks the same. It looks like the signatures don't really differ until September. So I definitely have some questions regarding the signoffs."

13

started domestic violence counseling that she had needed for a long time, and had not yet even commenced parenting classes. The court also noted that the section 388 petition "really should have been filed months ago."

The court therefore found that it was not in the minor's best interest to grant a hearing on Mother's section 388 petition, and that Mother had failed to present changed circumstances to warrant the granting of reunification services that she requested. It observed: "I cannot say it's in the child's best interest to wait and see if Mother can be successful when she hasn't even been able to fully engage in those services, let alone gain the insight, gain the progress that would be needed for us. Mother's timing is not aligned with [the minor's] case under the law."

### C. *No Abuse of Discretion*

The court did not abuse its discretion by denying Mother's request for a hearing on the section 388 petition. Mother was required to show both "(1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.]" (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) It was not an abuse of discretion for the court to have concluded that Mother satisfied neither element of the requisite prima facie showing.

With respect to a showing of changed circumstances, Mother's petition, coupled with the record of the hearing, indicated that she had enrolled in a drug treatment program on November 27, 2012. This recent enrollment was juxtaposed against evidence from the record, inter alia, of Mother's (1) reported nine-year history of alcohol and methamphetamine use; (2) lengthy delay in completing a second Proposition 36 drug treatment program ordered in 2011; (3) refusal of various requests for drug testing; (4) having left the Janus 28-day residential drug treatment program in July 2012 halfway through the program, reportedly because she was angry about a request by staff that she submit to drug testing; (5) failure to provide any drug test results to corroborate her claim that she had been sober since May 2012; (6) failure to explain why she waited until

14

November 19 to start domestic violence counseling, when she had been beaten and choked into unconsciousness by Father some eight months earlier; and (7) failure to provide any explanation for waiting until November 27—one week before the permanency hearing—to finally enter a drug treatment program. Based upon the facts of this case, we agree with the court below that the evidence provided in the petition that Mother had *commenced* taking steps to address the issues that had resulted in the minor being declared a dependent of the juvenile court did not represent "changed circumstances" under section 388.

The court likewise did not abuse its discretion by determining that Mother had failed to show that revoking any previous orders—i.e., in this instance, vacating the permanency hearing and ordering reunification—was in the best interests of the minor. Mother's conclusory allegation that the requested relief was in the minor's best interest was inadequate to satisfy Mother's requisite showing. (*In re Anthony W.*, *supra*, 87 Cal.App.4th at p. 250 [section 388 "petition may not be conclusory"].) As explained by Division Three of the Second District Court of Appeal: "At this point in the proceedings, on the eve of the selection and implementation hearing, the [child's] interest in stability was the court's foremost concern, outweighing any interest mother may have in reunification. [Citation.]" (*Id.* at pp. 251-252.) And as later explained by the same court, "[T]here is a rebuttable presumption that, in the absence of reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers. [Citation.] To rebut that presumption, a parent must make some factual showing [in the § 388 petition] that the best interests of the child would be served by modification." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 465.) Here, it was reported that the minor was doing well in her new foster home, and that the foster parents were stable and willing to adopt the minor. The fact that the petition alleged that Mother had begun to make some progress with the problems that had caused the minor to be declared a dependent of the juvenile court did

15

not establish that the granting of a hearing on the petition was in the minor's best interest. (*Id.* at pp. 464-465 [mother's showing of sobriety, completion of various classes, and recent employment insufficient to establish changing of prior order was in child's best interest].)

III. *Adoptability Finding Was Supported by Substantial Evidence*

A. *Applicable Law*

"A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*Ibid.*) In a case where the child is considered generally adoptable, the court does not look at the prospective adoptive home. (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 13.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. [Citations.] The evidence must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citation.] We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment. [Citation.]" (*In re Valerie W.*, *supra*, 162 Cal.App.4th at p. 13.)

B. *Background Concerning Adoptability Finding*

1. *Department's October 2012 Report*

In the Department's October 2012 section 366.26 assessment, the social worker described the minor as "a beautiful two[-]year old girl, full of energy and with a very strong personality. She is engaging and sweet. [The minor] has some medical issues that

16

appear to be correctable. She is generally a happy child. [The minor] is placed in the home of her prospective adoptive parents, who are willing and able to provide [the minor] with a forever home. In addition, if for some reason her current prospective adoptive parents were not able to finalize an adoption, there are families with approved home studies that are available to adopt children like [the minor]." Elsewhere, the social worker indicated that the minor was "a bright and sensitive child."

The social worker also noted that the minor had been evaluated by a physical therapist in June 2012 but had not qualified for services. The minor was reported as having "[d]elayed fine and gross motor skills as well as oral sensory issues. She has made good progress in the last 6 months and is expected to catch up."

Additionally, in the October 2012 assessment, the social worker identified the minor's current foster family (with whom the child was placed on October 3) as a San José couple without children who had been together since 1996 and had married in 2003. The foster mother had recently resigned from a human resources position at a high-tech firm to stay at home with the minor; the foster father worked as an engineer at a high-tech firm. The foster family was described as being "animal lovers [who] have two dogs and two cats in their home. [¶ They] have always thought about adoption as a way to build a family . . ." The social worker noted further that the "[foster] parents knew that they wanted to have a family, but knew that giving birth was not in their plans. [The foster] mother has been planning to adopt since she was a very young girl. When they met [the minor], they immediately knew that they wanted her to be part of their family." The Department reported that the foster family had no criminal or child welfare history.

It was noted in the assessment that the foster family had met the minor at the end of August 2012 and had "been working on transitioning her in[to] their home. It is clear that [the minor] enjoys being with this family and calls them 'mommy' and 'daddy.' [The foster] parents are very much in love with [the minor] and have opened their home and their heart[s] to her." The social worker indicated that although the minor was too young

to provide a statement, "she appears to be extremely comfortable and happy at the care of her [foster] parents."

The Department concluded in its report that the minor was "both generally and specifically adoptable."

### 2. *Developmental Evaluation*

Attached to the Department's section 366.26 assessment was a report of a developmental evaluation of the minor (evaluation) made by Dr. Barbara Bentley, a licensed psychologist, on August 27, 2012.[13] The minor's original foster mother, M.F., reported to Dr. Bentley that "when [the minor] first came to her care[,] she had significant difficulties in all areas." M.F. indicated that the minor "walked as if she [were a] very new walker[, seemed to have] had limited experience with eating . . . was terrified by water and baths and had significant oral aversions . . . [and] had significant sleep problems and had multiple nighttime wakings . . .[that were both triggered by large adenoids and possible sleep apnea as well as what appeared to be night terrors." M.F. reported that the minor had made great progress in four months but "still had significant needs and require[d] a great deal of individualized support. She is described as a very moody toddler."

Dr. Bentley in the evaluation noted that the minor "presented as an extremely shy toddler" who "[e]ventually . . . began to warm up"; was "a beautiful little girl" who was tall for her age; had "an obvious asymmetry to her face" possibly due to reportedly chewing on one side of her mouth; and expressed herself well and "showed a precocious use of language for her age." During the consultation, the minor "had a slight tantrum during the fine motor tasks and shut down completely and could not continue to

---

[13] Because of "high-risk factors associated with exposure to domestic violence and placement with the Dependency Court system," the minor was referred for evaluation by the Dominican Interdisciplinary Developmental Clinic.

participate in adult-directed activities." "A full assessment of [the minor's] behavioral functioning . . . was not completed" because she "shut down" for a portion of the evaluation.

In the evaluation, Dr. Bentley concluded: "[The minor] is a beautiful 25-month-old girl with a history of a removal from her biological family's care. . . . From report, there are a number of identified difficulties with her behavior, likely related to her history of exposure to domestic violence, possible neglect, and suspected abuse and the adjustment of having to count on various caregivers in her life. She does not yet feel safely attached and able [to] feel that her world is safe, reliable, or predictable, despite placement in a very nurturing, enriching, and loving foster home . . . [¶] However, on standardized measures of developmental functioning, [the minor] demonstrates average and above-average skills in all areas of development. She has average cognitive skills and average fine motor abilities. Both her receptive and expressive communication abilities are accelerated compared to other children her age. Despite her history of high-risk factors and behavioral dysregulation, she is able to show lovely developmental skills. These will be excellent assets for her learning how to adjust to a new home and once in a stable and consistent environment, she may be able to regulate her behavior with supports."

### 3. *Caregiver Information Form*

In connection with the permanency hearing, the foster parents submitted a caregiver information form with a letter attachment. In the letter attachment, the foster parents noted that the minor had been living in their home since October 3, 2012. They stated that "[s]he has adjusted beautifully during this transition." The minor was described as being very gentle with the couple's pets, and very social with other children (including those in the couple's extended family). Swinging in the park was her favorite activity. The foster family indicated that the minor was still attending occupational therapy, but that it had been reduced to one session a month and it was expected that it

19

would cease soon. "[The minor] continues to struggle with nightmares and nighttime awakening. . . . In general, she is terrified of the dark, of going to sleep, and of being alone (in her crib). We are careful to have soothing, consistent, bedtime routines in an effort to alleviate some of her anxiety around sleep. . . ." The foster family indicated that they "of course would love to adopt [the minor]." They indicated that Mother, although she had been given their phone number, had not called the couple for the six weeks (at the time the letter was written) that the minor had been placed with them.

### 4.    *The Court's Ruling*

The court, noting the statutory requirement that it find adoptability by clear and convincing evidence, concluded that the minor was generally and specifically adoptable. It observed: "[S]he is approximately two and a half and has transitioned well into a prospective adoptive home. She is healthy. . . . [T]he challenges that she's had with some of her fine and gross motor skills and sensory issues, she is catching up with the help of the . . . occupational therapy . . .[which] has decreased. Her developmental clinical assessment does not show any barriers." The court also noted that the prospective adoptive mother had quit her job in order "to stay home to give her . . . direct care and assistance[,] showing a higher level of commitment to this child to incorporate her into the family."

### C.    *The Adoptability Finding Was Proper*

Mother contends that the court's finding that the minor was adoptable was not supported by substantial evidence "because of a diagnosed mental handicap and emotional state making it difficult for a person to be willing to adopt her." Mother argues further that the fact that the minor had been placed in a home in which the foster parents expressed their willingness to adopt her "should not be accepted as proof of adoptability because of the [minor's] ongoing emotional issues and the prospective parents' inexperience."

We note at the outset that Mother did not raise this challenge below when the court made its adoptability finding. " 'Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule.' [Citation.]" (*People v. Butler* (2003) 31 Cal.4th 1119, 1126.) Thus, "while a parent may waive the objection that an adoption assessment does not comply with the requirements provided in section 366.21, subdivision (i), a claim that there was insufficient evidence of the child's adoptability at a contested hearing is not waived by failure to argue the issue in the juvenile court." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623; see also *In re Eric P.* (2002) 104 Cal.App.4th 395, 399.) Mother's claim is therefore cognizable on appeal.

As noted, the court considers, among other things, the age, physical condition and emotional health of the child in determining his or her adoptability. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) Here, the minor's young age (approximately two years and four months at the time of the permanency hearing) and good physical health were both "attributes indicating adoptability." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)[14] Further, the psychologist, Dr. Bentley, concluded that "on standardized measures of developmental functioning, [the minor] demonstrates average and above-average skills in all areas of development." Dr. Bentley concluded that the minor showed "accelerated" communication skills—she tested at a "combined language score of 124[, which] falls at the 95th percentile." The professional indicated further that despite the challenges the minor had faced, she was "able to show lovely developmental skills."

---

[14] The only issue concerning the minor's physical health noted by the social worker involved delayed gross and fine motor skills and oral sensory issues. The social worker noted that the minor had "made good progress in the last 6 months and [was] expected to catch up."

21

The record showed that the minor had some emotional difficulties reported by her original foster mother and noted by Dr. Bentley, including sleeping difficulties and nightmares. And the current foster parents acknowledged that the sleep and nightmare issues persisted at the time of their report (November 12, 2012), and that they were working closely with the minor to address them. But there was no indication from any professional that these emotional issues were ones that were considered to be serious or permanent, or that they in any way served as an impediment for adoption. We conclude that the minor's emotional issues did not preclude a finding of adoptability and that the court may have impliedly considered them to have been transitory and the result of the circumstances that had caused the minor to become a dependent of the juvenile court. (See *In re I.I.* (2008) 168 Cal.App.4th 857, 871 [adoptability finding upheld notwithstanding existence of some emotional issues, considering children's good health, attractiveness, intelligence, and prospective adoptive placements].)

In addition, the minor here did have a family, her current foster parents, who indicated a willingness and ability to adopt her. This was another factor supporting adoptability. "[A] prospective adoptive parent serves as evidence a child is likely to be adopted within a reasonable time either by the prospective adoptive parent or some other home. [Citation.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

We conclude from the record that there was substantial evidence in support of the court's finding that the minor was adoptable.

IV.     *Court's Rejection of Beneficial Parental Relationship Exception*

A.     *Applicable Law*

Under the beneficial parental relationship exception, the parents must establish that they "have maintained regular visitation and contact with the child and the child

would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)**15**  This requires a two-prong showing by the parent that (1) he or she has maintained regular visitation, and (2) the child would benefit from continuing the relationship.  (*In re Marcelo B.*, *supra*, 209 Cal.App.4th at p. 643.)  " 'Sporadic visitation is insufficient to satisfy the first prong' of the exception."  (*Ibid.*, quoting *In re C.F.* (2011) 193 Cal.App.4th 549, 554.)  In order to establish the second prong, the parent must show "that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.]" (*In re Marcelo B.*, at p. 643, original italics, quoting *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)  The burden is on the parent asserting the beneficial parent relationship to produce evidence establishing that exception.  (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527.)

In determining whether the beneficial parental relationship exception applies, the court balances the degree of benefit that a continuation of the parental relationship would afford versus the benefit of placing the child with adoptive parents.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  As one court has explained:  "[W]e interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the

---

**15** "[T]he court shall terminate parental rights unless either of the following applies:  [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1).)

child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Application of the beneficial relationship exception is a case-specific endeavor. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.) " 'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.]" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.)

Review of a court's determination of the applicability of the parental relationship exception under section 366.26 is governed by a hybrid substantial evidence/abuse of discretion standard. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. [¶] The same is not true as to the

24

other component of . . . the parental relationship exception . . . [, which] is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Ibid.*, original italics; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [following *In re Bailey J.*].)

### B. *Background Concerning Parental Relationship Exception*

The court at the permanency hearing considered documentary evidence, namely, the Department's section 366.26 assessment (along with the attached developmental evaluation by Dr. Bentley), the caregiver information form provided by the current foster family, and logs containing narratives concerning Mother's supervised visits with the minor. It also heard testimony from Mother.

In its report, the Department noted that the minor had had three supervised visits with Mother, in August, September, and October. The social worker described these visits as follows: "[Mother] is always at the office before [the minor] arrives. [Mother] usually takes [the minor] out of the car seat and carries her to the playground. [Mother] brings coloring books, bubbles and other appropriate activities for [the minor] on each visit. [Mother] takes pictures of [the minor]. [The minor] appears to enjoy her time with [Mother] and laughs and plays with her [M]other. [Mother] is appropriate with [the minor] and [the minor] has a good time visiting her. On 9/10/12, [the minor] had a difficult time at the end of the visit and did not want to stop playing to get in the car with

25

her foster mother. [Mother] began crying and [the minor] cried as well. As soon as [the minor] was buckled in her car seat, she calmed down and asked for some ice cream." "After visits with her birth [M]other, [the minor] tends to behave normally."**16**

Mother testified that during her monthly visits, the minor, "calls me [']mommy,['] she knows who I am. She always . . . hugs me, she clings to me a lot more than she wants to play. She just want[s] to be attached to me. . . . [I]t's good. She misses me and I can tell." Mother typically brought snacks, toys, and bubbles. They colored, drew, and played with toys. When they separated at the end of their visits, Mother typically placed [then minor] in a car seat. Mother testified: "And I usually tell her I'll see her next time because she doesn't want to go. She usually starts to cry, and she . . . [resists Mother] putting her in the car seat. She doesn't want to go. She's really attached."

In her testimony, Mother explained that she did not want her parental rights terminated "[b]ecause I'm changing my life and I've moved away. . . [The minor] is a big part of my life. . . [S]he's my world. . . I don't feel that my rights should be terminated because I'm changing my life. I know I can be the Mother that I can be to her, and . . . without her in my life[,] it's just devastating."

Mother testified that she believes it would be beneficial to the minor for her to continue visiting Mother "[be]cause we have a close bond. She's my baby and I'm her mother. . . . [S]he knows who I am . . . She . . . needs me in her life. We need to have this bond, this connection between us, because . . . it helps her from the emotional . . . devastation. It's . . . traumatizing . . . when you're torn away from your mother. . . And [the minor] was with me all the time. We did everything together. . . . I've noticed since

---

**16** In the evaluation, Dr. Bentley reported that, according to the minor's original foster mother, "when visitations are only with her [M]other, the difficulties are minimal; however, there are significant difficulties and a strong negative reaction if [the minor's] maternal grandmother participates in visits."

26

our visits have begun, . . . she's changing . . . I try to tell her I love her, and she just puts her head down. And before she used to tell me she loves me back. And you can just see the time that is separated between us is taking a toll on her mentally, physically and emotionally. And . . . she is so young and this isn't [in] the best interest of her to be separated from me."

After finding the minor to be adoptable, the court concluded that there was no compelling reason for finding that termination of parental rights would be detrimental to the child. The court noted that the visits between Mother and the minor were "sweet" and "appropriate." It found it "telling" that the minor no longer responded when Mother told her that she loved her. It acknowledged that Mother had regular visitation and contact with the minor, but indicated that it could not find "that the child would benefit from continuing a relationship [with Mother inasmuch] as the child is in a parental relationship with caregivers and not Mother."

C.      *No Error in Rejection of Beneficial Parental Relationship Exception*

Mother argues that the court erred in terminating her parental rights, which was a consequence of its finding inapplicable the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). She asserts that she met her dual burden of establishing (1) her regular visitation of the minor, and (2) there was a significant and positive emotional attachment between the minor and Mother. Mother contends further it was shown that continuation of the parent-child relationship would promote the minor's well-being to such a degree that it would outweigh the potential benefits the child would receive from a permanent home with adoptive parents.

We find no error in the court's rejection of the beneficial parental relationship exception in this case.

We first consider whether Mother demonstrated the existence of a beneficial parental relationship by the two-prong showing of (1) regular visitation and (2) that the child would benefit from continuing the relationship. (*In re Marcelo B.*, *supra*, 209

27

Cal.App.4th at p. 643.) The court found that there had been regular visitation and contact by Mother,[17] and this conclusion is supported by substantial evidence. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) But it did not find that the minor would benefit from continuing the relationship with Mother. Since Mother, as the proponent of the exception, had the burden of producing evidence showing its existence (*id.* at p. 1314), the court's conclusion that she did not satisfy the second prong of the exception "turns on a failure of proof at trial, [such that] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

In determining whether the relationship between parent and child is beneficial, we look to such factors as "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. [Citation.]" (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 467, fn. omitted.) As we have noted, the age of the minor favored her adoptability. (*In re Gregory A.*, *supra*, 126 Cal.App.4th at p. 1562.) The evidence concerning the portion of the minor's life that she had spent in Mother's custody was equivocal. At one time before the Department's filing of the petition in April 2012, Mother was living with the minor and minor's grandmother, J.R., in the home of the minor's great-grandmother. At some point, however, Mother left the home (without the minor) at the great-grandmother's request. Although the interaction between Mother and child from supervised visitation was positive, the Department reported that "Mother's untreated substance abuse issues have not allowed for [her] and [the minor] to have a

---

[17] The court noted a caveat to this finding, expressing some concern that, although Mother had been given the contact information of the minor's current caregivers on October 10, 2012, she had failed to make contact with them to ask about the minor's well-being.

mother/daughter relationship. It continues to be unclear as to who was the primary care provider for [the minor,] as maternal grandmother claims that she had been taking care of [the minor] for most of her life. [The minor] appears to have a visiting relationship with her birth mother." Further, Mother had offered no bonding study or other evidence showing that termination of parental rights would have a significant (or even any) actual detriment on the minor's life. (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.) And the particular needs of the minor, as indicated in the Department's section 336.26 assessment, were that she be given the opportunity to live in a stable, drug-free, violence-free home environment, one that she had not experienced at all during her short life before being declared a dependent of the juvenile court.

There was indeed evidence that the Mother's contacts with the minor were positive—"sweet" and "appropriate" in the words of the trial court. But even if the Mother and the minor may have had "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), or "frequent and loving contact or pleasant visits" (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555), these factors would not satisfy Mother's burden of showing the existence of a beneficial parental relationship. In short, there was a failure of proof by Mother that the minor would benefit from continuing her relationship with Mother. Thus, "the evidence [does not] compel[] a finding in favor of the appellant as a matter of law. [Citations.]" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)[18]

---

[18] The Mother also challenges the trial court's view that it was "telling" that the minor failed to respond and put her head down when Mother told her that she loved her. The court indicated that this fact suggested that the minor was "making a transition into looking to another adult for love, care, support and comforting at this time." Mother contends that it "more likely [suggested] the opposite[:] . . . the distress the child was experiencing being separated from Mother." Whether the court was correct in its supposition concerning the minor's reaction to Mother telling her that she loved her is not relevant to our review of whether it erred in rejecting Mother's claim of the beneficial

*(continued)*

But even if we were to conclude (which we do not), based upon our review of the record for substantial evidence, that Mother established as a matter of law the existence of a beneficial parental relationship, her appellate claim nonetheless fails. Mother was also required to show that the purported existence of the beneficial parental relationship presented "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) This is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.]" (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315, original italics.) Given the evidence that the minor was adoptable and was currently living in a stable home with prospective adoptive parents, balanced against evidence that there was not a close mother-child relationship between the minor and Mother and the history of Mother's drug, crime, and domestic violence issues, the court did not abuse its discretion. The court's implicit conclusion that "severing the natural parent/child relationship would [not] deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) was not one that " 'exceeded the bounds of reason.' " (*In re Stephanie M., supra,* 7 Cal.4th 295, 318-319.)

In short, this is not a case involving "*exceptional circumstances* [citation] [in which the court is permitted] to choose an option other than the norm, which remains adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) We thus find that there was substantial evidence supporting the trial court's conclusion that Mother failed to establish the existence of the beneficial parental relationship between her and the minor, and it did

---

parental relationship exception. "The juvenile court's reasoning is not a matter for our review. [Citation.]" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

not abuse its discretion by finding that any purported existence of such a relationship did not present a compelling reason to apply this statutory exception in lieu of adoption.

## DISPOSITION

The December 4, 2012 order approving adoption as the permanent plan for B.M. and terminating the parental rights of Mother and Father is affirmed.

Márquez, J.

WE CONCUR:

Rushing, P. J.

Grover, J.